ORDERED.

**Dated:  February 26, 2021**

Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WILLIAM W. COLE, JR., | ) | Case No. 6:15-bk-06458-KSJ |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| PRN REAL ESTATE & | ) | |
| INVESTMENTS, LTD., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 6:15-ap-00168-KSJ |
| | ) | |
| WILLIAM W. COLE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff, PRN Real Estate & Investments, Ltd. ("PRN"), is a company owned

and operated by Nancy Rossman and her family. Rossman and Defendant, William

W. Cole, Jr., are former romantic and business partners. Cole and Rossman have a

contentious business and personal history. In 2012, they settled their business dispute. But the settlement failed in 2014, and extensive litigation between the parties has ensued ever since.[1]

On July 27, 2015, Cole filed this Chapter 7 bankruptcy case seeking to discharge his substantial debts to Rossman, PRN, and his other creditors.[2] PRN filed its thirteen-count complaint in this proceeding seeking to have the debts Cole owes PRN determined to be nondischargeable and to deny Cole his Chapter 7 discharge.[3]

In its six *remaining* counts,[4] PRN asserts that Cole's debts are nondischargeable under Bankruptcy Code[5] §§ 523(a)(2)(A) [Count 1] and 523(a)(2)(B) [Count 2] and that Cole is not entitled to a discharge under Bankruptcy Code §§ 727(a)(2)(A) [Count 8], 727(a)(2)(B) [Count 9], and 727(a)(4)(A) [Count 11].[6] PRN also asks the Court to

---

[1] The first lawsuit between the parties was filed on July 28, 2014. Rossman and PRN filed that action in Florida state court and named Cole, his wife Terre, and one of his business entities, Cole of Orlando Limited Partnership, as defendants. *PRN Real Estate & Invs., Ltd, et. al. vs. William W. Cole, Jr., et. al*, Case No. 2014-CA-008104-O, Circuit Court for the 9th Judicial Circuit, in and for Orange County, Florida. Other lawsuits followed.

[2] *Voluntary Pet.*, Case No. 6:15-bk-06458-KSJ, Doc. No. 1.

[3] *Third Amended Complaint to Determine Dischargeability of Debt and Deny Debtor a Discharge* (the "Third Amended Complaint"), Adv. Doc. No. 230.

[4] On August 16, 2018, the Court granted summary judgment in Cole's favor on Counts 3 through 6. *Order Granting Motion for Summary Judgment on Counts III – VI of the Third Amended Complaint*, Adv. Doc. No. 401. PRN later abandoned Counts 10, 12, and 13, as reflected in the Order Partially Granting Debtor's *Ore Tenus* Motion for Judgment on Partial Findings Under Bankruptcy Rule 7052(C). Adv. Doc. No. 425. Thus, the remaining counts are Counts 1, 2, 7, 8, 9 & 11.

[5] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et seq.*

[6] *Third Am. Compl.*, Adv. Doc. No. 230, Counts 1, 2, 8, 9, and 11.

assess the amount of PRN's claim against Cole [Count 7].[7] Cole strenuously denies PRN's allegations.[8]

After trial,[9] and in consideration of the record (including the parties' post-trial briefs),[10] final judgment is entered for Cole on all counts. Thus, Cole will receive a discharge, and any debts Cole owes PRN are dischargeable.

## I. Due Process and Fairness Protections

Before explaining the basis for my ruling, I first need to address due process and fairness concerns. After trial concluded on October 12, 2018, the Honorable Cynthia Jackson, who administered this bankruptcy case and conducted the trial in this proceeding, encountered serious medical issues that precluded her from entering a final ruling. So, on July 21, 2020, Cole's bankruptcy case and all related adversary

---

[7] *Third Am. Compl.*, Adv. Doc. No. 230, Count 7.

[8] *Def.'s Answer & Affirmative Defenses to Third Am. Compl.*, Adv. Doc. No. 241.

[9] The seven-day trial occurred on July 16 – 19, 2018; September 11 – 12, 2018; and October 12, 2018. The following witnesses testified at trial: Cole; Rossman (PRN's Representative); PRN's proffered expert, Susan Smith; Cole's proffered expert, Robert Morrison; and the Chapter 7 Trustee, Lori Patton. On October 20, 2020, Cole also was allowed to supplement his testimony on a discrete issue. Transcripts are located at Adv. Doc. Nos. 412 (July 16, 2018); 413 (July 17, 2018); 465 (July 18, 2018); 414, 466, and 467 (July 19, 2018); 429 (September 11, 2018); 430 and 431 (September 12, 2018); 432 (October 12, 2018); and 488 (October 20, 2020).

Although the trial lasted seven days, the transcript is numbered consecutively from page 1 to page 1,438. Citations to the trial transcript will follow this format: Trial Tr. [page]:[line]. Citations to Cole's supplemental testimony will follow this format: Supp. Tr. [page]:[line].

The trial record also includes deposition testimony in lieu of live testimony of these parties: Terre Cole (Adv. Doc. No. 403); Frederic G. Schaub (Adv. Doc. No. 404); Kimberly Griffin, individually and on behalf of Griffon Properties, LLC (Adv. Doc. No. 405); Jacob Farmer (Adv. Doc. No. 406); and Richard Farmer, individually and on behalf of Andermer, LLC (Adv. Doc. No. 407). Citations to the deposition testimony will follow this format: [Name of Deponent] Dep., Adv. Doc. No. [#], [page]:[line].

[10] *Pl.'s Post-Trial Brief*, Adv. Doc. No. 435; *Def.'s Post-Trial Brief*, Adv. Doc. No. 436.

proceedings, including this one, were reassigned to me. I had a lot of catching up to do to ensure both parties receive a full and fair ruling on all issues: I read the entire record, including the trial transcript and depositions admitted in lieu of testimony; I reviewed all the admitted trial exhibits; and I otherwise immersed myself in this adversary proceeding.

Before issuing this Memorandum Opinion, I also held three status conferences to help me understand the background of this proceeding and the pending factual and legal issues.[11] Attorneys for both parties were forthright and helpful. I am grateful for their cooperation and professionalism. We openly discussed ways for both parties to feel secure they received a full and fair hearing and proper due process in these tragic circumstances.

We also discussed whether the parties wanted to present any supplemental testimony and whether they preferred that my initial ruling be preliminary (as opposed to final) so they could comment on my ruling and correct any errors that may have arisen from my not having lived through the last five years of this dispute. The attorneys conferred with their clients and filed post-trial responses agreeing no further testimony was needed and requesting a preliminary ruling to allow them to identify errors.[12]

---

[11] The status conferences were held on August 7, 2020 (Adv. Doc. No. 461), September 15, 2020 (Adv. Doc. No. 463), and October 20, 2020 (Adv. Doc. No. 485).

[12] *Pl.'s Notice Regarding Pending Rulings, Need to Re-call Witnesses, and Preference for Prelim. Ruling*, Adv. Doc. No. 471; *Def.'s Resp. to Court Inquiries*, Adv. Doc. No. 472.

Although the parties did not see the need for supplemental testimony, I ultimately decided that I needed additional testimony from the Chapter 7 Trustee and Cole—and an opportunity to observe Cole's demeanor while testifying—regarding a narrow yet important issue. Cole and the Chapter 7 Trustee testified on October 20, 2020. Once Cole and the Chapter 7 Trustee testified, the record was final, except for a few open evidentiary and judicial notice issues, which the Court has since resolved.[13]

On December 8, 2020, the Court entered a *Preliminary* Memorandum Opinion.[14] The parties had until December 22, 2020, to identify any errors or omissions in the Court's preliminary ruling.[15] The parties also had the opportunity to reply to the errors or omissions identified by each other.[16] Both parties have now done so.[17] The Court has considered the parties' filings (and the errors and omissions each party identified) and now issues this final Memorandum Opinion.

## II.    Background.

William Cole is well educated and an experienced businessman. He was a certified public accountant and a chief financial officer at a local bank.[18] By 2000, Cole

---

[13] *Order Resolving Pending Evidentiary Issues*, Adv. Doc. No. 492; *Order Partially Granting & Denying Parties' Requests for Judicial Notice*, Adv. Doc. No. 493.

[14] *Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 491, Ex. A.

[15] *Id.* at 2.

[16] *Id.*

[17] *Pl.'s Resp. Pursuant to Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 495; *William W. Cole, Jr.'s Resp. to Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 496; *Pl.'s Reply to Def.'s Resp. to Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 500; *William W. Cole, Jr.'s Reply to Pl.'s Resp. to Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 501.

[18] Trial Tr. 45:7 – 47:11.

focused on real estate projects for his primary livelihood. The size of Cole's real estate projects varied greatly from single luxury homes to large residential and commercial projects. Cole specialized in finding projects, attracting investors, and then managing the construction aspects, usually partnering with an experienced builder. Perhaps one could consider Cole a "middleman" who connects wealthy investors with builders with construction expertise.

Over the years, Cole formed numerous separate business entities for his real estate development projects. Some, like C&G Real Estate Group, LLC ("C&G"), were operating entities so Cole and a business partner, Allan Goldberg, could locate and develop different projects together. But most of the multitude of business entities Cole formed related to specific projects. Each project had one or more associated and specialized business entities, allowing Cole to account for capital investments, expenses, and profits on a project-by-project basis. Cole was involved with over forty entities.

PRN Real Estate & Investments, Ltd. is owned by Nancy Rossman and her sisters, Paula and Ruth—PRN. (Nancy Rossman is PRN's primary representative.) Starting in 2000, PRN funded numerous projects that Cole proposed through C&G (and perhaps other operating entities). Cole and Rossman worked closely on these projects, which were complex and expensive. And, for many years, they trusted each other.[19]

---

[19] Trial Tr. 793:1 – 8.

By 2008, however, when the real estate recession was most pronounced, losses on these projects were mounting. In November 2008, PRN agreed to loan additional capital to complete Cole's projects, with Cole personally guaranteeing repayment of the loans.[20]   Cole however did not pay PRN when the loans came due on November 25, 2011.[21]

So, the parties started discussing a refinement to their earlier deal, and on June 2, 2012, they reached a new agreement (the "Settlement Agreement").[22] Under the Settlement Agreement, Cole had to end his business relationship with Goldberg. He also had to continue working with PRN on older projects and give PRN an opportunity to invest in his new projects. The Settlement Agreement also required Cole to make certain percentage payments (and provide extensive financial reporting) to PRN.

Without doubt, Cole eventually breached his duties under the Settlement Agreement. In 2014, two years after the parties had entered into the Settlement Agreement, PRN declared the agreement in default and sued Cole and others in state court. By that point, any trust between the parties had dissolved.

On July 27, 2015, Cole filed this Chapter 7 bankruptcy case. Cole's bankruptcy case is, for all practical purposes, a two-party dispute between Cole and Rossman (and

---

[20] PRN Ex. 1, Adv. Doc. No. 318-1.

[21] Trial Tr. 56:3 – 11.

[22] PRN Ex. 2, Adv. Doc. No. 318-2. Although the Settlement Agreement was entered into on June 2, 2012, it was effective as of May 8, 2012.

the entities she controls, such as PRN).[23] PRN timely filed this adversary proceeding seeking to have the debts Cole owes PRN determined to be nondischargeable and to deny Cole his Chapter 7 discharge.

The parties now are engaged in open warfare, as demonstrated by the ire displayed during the trial. The conclusions and findings that follow are my best attempt to rule on the legal and factual issues raised while avoiding the emotional minefield between the parties.

### III. PRN failed to prove that its debt is nondischargeable under §§ 523(a)(2)(A) and (B) (Counts 1 and 2) because the evidence showed Cole intended to perform under the Settlement Agreement and did not misrepresent the Schaub Obligations.

In Count 1, PRN asserts Cole fraudulently induced it to enter into the Settlement Agreement[24] by promising to perform the duties specified in the agreement even though he had no intention of doing so. Specifically, PRN argues Cole never intended to (1) offer PRN opportunities to invest in new joint ventures before doing any new deal with a third party, as required in paragraph 15 of the Settlement Agreement; (2) make the payments required under the Settlement Agreement; or (3) otherwise do what he promised. In Count 2, PRN also asserts that Cole affirmatively misrepresented his financial condition by misrepresenting his supposed right to receive

---

[23] Fourteen claims have been filed in this case. Two claims appear unrelated to the dispute between Cole and Rossman: Claim No. 1 by Valley National Bank for $1,262,000; and Claim No. 2 by Gateway Bank of Florida for $1,702,200. The other twelve claims were filed by Rossman, PRN, related businesses, or family members. These Rossman-related claims total more than $155 million. The Court makes no finding as to the legitimacy or duplicative nature of these claims. It is obvious, however, that the primary creditor is Rossman, her family, or companies she controls.

[24] PRN Ex. 2, Adv. Doc. No. 318-2.

payments from Fred Schaub (the "Schaub Obligations") in paragraph 2(c) of the Settlement Agreement.

According to PRN, Cole's alleged fraudulent misrepresentations render the debt he owes PRN nondischargeable under Bankruptcy Code §§ 523(a)(2)(A) and (B), which generally except from the discharge debts resulting from fraudulent misrepresentations. The requirements of Bankruptcy Code §§ 523(a)(2)(A) and (B) are similar. Both § 523(a)(2)(A) and § 523(a)(2)(B) require a creditor to prove that the debtor made a false representation with the intent to deceive the creditor; the creditor justifiably or reasonably relied on the representation; and the creditor sustained a loss because of the misrepresentation.[25] The only difference between the sections is that § 523(a)(2)(A) is broad in scope, excepting from the discharge debts resulting from any fraud or false representation other than a statement respecting the debtor's (or an insider's) financial condition,[26] whereas § 523(a)(2)(B) is more narrow, applying only to false representations made in writing respecting the debtor's financial condition.[27]

Here, most of the testimony regarding fraud revolved around Cole's alleged lack of intent to perform under the Settlement Agreement. PRN, however, also introduced

---

[25] *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998) (setting forth the elements of a claim under § 523(a)(2)(A)); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994) (setting forth the elements of a claim under § 523(a)(2)(B)).

[26] 11 U.S.C. § 523(a)(2)(A) (excepting from the discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition").

[27] 11 U.S.C. § 523(a)(2)(B) (excepting from the discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . use of a statement in writing . . . that is materially false[] respecting the debtor's or an insider's financial condition").

evidence of Cole's representations regarding his supposed right to receive payments from Schaub (i.e., the Schaub Obligations), which go to Cole's financial condition. Thus, both § 523(a)(2)(A) and § 523(a)(2)(B) apply here. But, after evaluating all the evidence, I conclude that PRN has failed to establish a claim for fraudulent inducement under either § 523(a)(2)(A) or § 523(a)(2)(B).

### A. Cole consistently performed his duties under the Settlement Agreement.

As a starting point, there is no question Cole breached the Settlement Agreement. Breach of a contractual obligation, however, rarely gives rise to a § 523(a)(2)(A) claim.[28] To raise a § 523(a)(2)(A) claim based on a debtor's failure to perform a promise, a creditor must show that the debtor lacked the subjective intent to perform the promise when the promise was made.[29] So the issue here is whether Cole convinced PRN to sign the Settlement Agreement in June 2012, knowing *at that time* that he never intended to perform his contractual obligations.

PRN failed to make that showing here. As to Cole's overall performance under the Settlement Agreement, he performed for two and a half years. Rossman's testimony confirms Cole at least partially performed his contractual obligations.[30] For

---

[28] *Rosenberg Ventures, Inc. v. Velasco (In re Velasco)*, 617 B.R. 718, 734 – 35 (Bankr. M.D. Fla. 2020) ("Ordinarily, a broken promise to perform in the future does not give rise to a § 523(a)(2) claim.").

[29] *Cary v. Vega (In re Vega)*, 503 B.R. 144, 148 (Bankr. M.D. Fla. 2013) ("Statements of intent to perform certain acts in the future 'will not generally form the basis of a false misrepresentation that is actionable under Section 523(a)(2)(A) unless the creditor can establish that the debtor lacked the subjective intent to perform the act at the time the statement was made.'") (quoting *Duncan v. Bucciarelli (In re Bucciarelli)*, 429 B.R. 372, 375 (Bankr. N.D. Ga. 2010)).

[30] Trial Tr. 1022:23 – 1023:2; 1027:8 – 11.

instance, he continued working on older and new joint projects with PRN.[31] Because of Cole's help on these PRN projects, PRN received over $14 million *after* signing the Settlement Agreement.[32] And Cole gave PRN numerous opportunities to join him in new deals as required by paragraph 15 of the Settlement Agreement.[33]

Cole also performed numerous other requirements under the Settlement Agreement. He stopped doing business with his former business partner, Allan Goldberg, as required by paragraph 2(e) of the Settlement Agreement.[34] He timely paid PRN $191,533.12 on July 10, 2014, which was the first payment required under paragraph 9 of the Settlement Agreement.[35] Indeed, Rossman confirmed Cole never had a monetary breach of the Settlement Agreement.[36] As required under paragraph 13 of the Settlement Agreement, Cole provided extensive financial reporting to PRN from December 2012 through December 2014,[37] even after PRN had declared Cole in

---

[31] Trial Tr. 497:7 – 21; 508:16 – 509:12; 592:5 – 593:18.

[32] Trial Tr. 612:13 – 613:10.

[33] *See, e.g.*, Cole Ex. 29, Adv. Doc. No. 307-29; Cole Ex. 74, Adv. Doc. No. 307-74; Cole Ex. 87, Adv. Doc. No. 308-12; Cole Ex. 261, Adv. Doc. No. 313-24; Cole Ex. 299, Adv. Doc. No. 314-11; & Cole Ex. 300, Adv. Doc. No. 314-12; Trial Tr. 835:24 – 836:12.

[34] Trial Tr. 425:1 – 427:1.

[35] PRN Ex. 2, Adv. Doc. No. 318-2, ¶ 9, pg. 7; Trial Tr. 429:7 – 433:17; 995:3 –996:22.

[36] Trial Tr. 996:10 – 22.

[37] At least four times, PRN granted Cole short extensions to provide these reports. Debtor Exs. 27, 31, 36 & 254. PRN, at least at that point, was satisfied with the financial information Cole was supplying under the Settlement Agreement. Cole also forwarded numerous real estate-related documents to PRN between December 2012 and December 2014. Cole Ex. 14, Adv. Doc. No. 307-14; Cole Ex. 19, Adv. Doc. No. 307-19; Cole Ex. 20, Adv. Doc. No. 307-20; Cole Ex. 22, Adv. Doc. No. 307-22; Cole Ex. 24, Adv. Doc. No. 307-24; Cole Ex. 29, Adv. Doc. No. 307-29; Cole Ex. 30, Adv. Doc. No. 307-30; Cole Ex. 35, Adv. Doc. No. 307-35; Cole Exs. 40 – 42, Adv. Doc. Nos 307-40 – 307-42; Cole Exs. 49 – 51, Adv. Doc. Nos. 307-49 – 307-51; Cole Ex. 53, Adv. Doc. No. 307-53; Cole Ex. 56, Adv. Doc. No. 307-56; Cole Ex. 59, Adv. Doc. No. 307-59; Cole Ex. 63, Adv. Doc. No. 307-63; Cole Ex. 76,

default under the Settlement Agreement.[38] These are hardly the actions of someone who never intended to perform his contractual obligations.

Cole likely did not supply *all* the financial information requested by PRN or offer PRN *every* possible joint venture option. He may not have done everything required under the Settlement Agreement. He breached the Settlement Agreement. But he demonstrated he wanted to, and substantially did, perform his duties under the Settlement Agreement.

It is worth noting that, even though PRN claims Cole never intended to perform the Settlement Agreement, PRN did not declare a default under the Settlement Agreement until over two years after the parties signed it.[39] PRN's complaints about the *extent* of Cole's performance ring hollow when PRN had ample notice of possible breaches as early as July 2012 but never declared a default.[40]

PRN has established no type of fraudulent inducement claim under §523(a)(2)(A). Cole signed the Settlement Agreement intending to perform, and he

---

Adv. Doc. No. 308-1; Cole Ex. 78, Adv. Doc. No. 308-3; Cole Ex. 79, Adv. Doc. No. 308-4; Cole Ex. 84, Adv. Doc. No. 308-9; Cole Exs. 87 – 95, Adv. Doc. Nos. 308-12 – 308-20; Cole Ex. 128, Adv. Doc. No. 310-3; Cole Ex. 239, Adv. Doc. Nos. 313-1 & 313-2; Cole Ex. 266, Adv. Doc. No. 313-29; Cole Exs. 277 – 280, Adv. Doc. Nos. 313-40 – 313-43; Cole Ex. 295, Adv. Doc. No. 314-7.

[38] Cole Ex. 65, Adv. Doc. No. 307-65.

[39] *Id.*

[40] For example, PRN now contends Cole breached the Settlement Agreement by forming Coledev, LLC with his wife and son in July 2012. *Pl.'s Post-Trial Brief*, Adv. Doc. No. 435 at 25. But Cole sent PRN a copy of the proposed Operating Agreement *before* forming Coledev. Cole Ex. 101, Adv. Doc. No. 309-1; Trial Tr. 478:21 –481:19. Rossman objected in writing to Cole starting this family business. PRN Ex. 254, Adv. Doc. No. 352-3; Trial Tr. 823:9 – 826:13. But PRN did not deem it an event of default until *years* later. PRN and Cole continued working under the Settlement Agreement for another two years even though Rossman had actual knowledge Cole was using Coledev, LLC as his primary operating entity.

largely *did* perform. Thus, PRN failed to establish that its debt is nondischargeable under § 523(a)(2)(A). Cole is entitled to judgment in his favor on Count 1.

### B.    Cole did not misrepresent the Schaub Obligations.

Fred Schaub and Cole are friends. Before 2008, Schaub would build houses with money invested by Cole and his partner, Goldberg, through their jointly owned entity C&G Real Estate Group, Inc. Schaub built homes under an umbrella of entities defined in the Settlement Agreement as the "Arlington Entities."[41] By the time Schaub stopped construction after the real estate crash in 2008, Cole, Goldberg, or C&G Real Estate Group, Inc. had advanced roughly $980,000 to Schaub and the Arlington Entities. The $980,000 in advances remained unpaid in 2012, when Cole was negotiating the Settlement Agreement with PRN. Schaub had no legal obligation to repay these advances.

Because Schaub and Cole remained friends and hoped to do business together in the future, however, they discussed an arrangement where Schaub would share 25% of his net profits on future unidentified projects to help Cole, Goldberg, and C&G Real Estate Group, Inc. recapture some of their lost investments.[42] But Schaub paid little or nothing to Cole under this loose, unenforceable, verbal agreement between friends.[43]

---

[41] PRN Ex. 2, Adv. Doc. No. 318-2, Ex. A, ¶ 3. "Arlington Entities" is defined as "Arlington Homes, LLC, Hanover Homes of Winter Park, LLC, Arlington Homes of Winter Park, LLC or other entities involving Fred Schaub and Lance Earl or related to the homebuilding business."

[42] Trial Tr. 361:1 – 365:11; 390:7 – 392:13.

[43] It appears Schaub paid a small amount to C&G Housing Investments, LLC, perhaps under this loose agreement with Cole. Cole Ex. 119, Adv. Doc. No. 309-19; Trial Tr. 368:10 – 373:18.

And Schaub's testimony is ambiguous whether he ever intended to pay Cole anything.[44]

When Cole and PRN were negotiating the Settlement Agreement, which generally required Cole to pay PRN 20% of his "Net Cash" (other than from certain outside activities and existing deals), he asked to keep 50% of any payments C&G Real Estate Group, Inc. received from Schaub (i.e., the Schaub Obligations).[45] Paragraph 2(c) was added to the Settlement Agreement at Cole's insistence so that Cole did not have to include the Schaub Obligations when calculating amounts he owed to PRN under the Settlement Agreement.[46]

Thus, under paragraph 2(c), Cole was allowed to keep 50% of any payments C&G Real Estate Group, Inc. received from Schaub, even if PRN later assumed control of C&G Real Estate Group, Inc.[47] After Cole and PRN entered into the

---

[44] Schaub Dep., Adv. Doc. No. 404, 36:6 – 42:16; 63:3 – 64:5; 67:24 – 69:15.

[45] PRN Ex. 2, Adv. Doc. No. 318-2, Ex. A, ¶ 20(c). PRN points to emails between Cole and Rossman discussing revisions to the "Schaub Obligations" portion of the Settlement Agreement, arguing the e-mails confirmed that Cole misrepresented that the Schaub Obligations were an enforceable debt. PRN Ex. 247, Adv. Doc. No. 326-27, at 10, 13, 17 & 21. I did not read these emails that way and found no significant inconsistency between the content of these emails and the final language in paragraphs 2(c) and 20 (c) of the Settlement Agreement. Cole never misrepresented the Schaub Obligations as a legally enforceable debt—before, during, or after he signed the Settlement Agreement.

[46] Section 11 of the Settlement Agreement describes Cole's payment obligations to PRN using defined terms "Net Cash" and "Percentage Payment." PRN Ex. 2, Adv. Doc. No. 318-2, ¶ 11. Under paragraph 2(c), 50% of monies paid by Fred Schaub or his entities would not be included in this calculation. PRN Ex. 2, Adv. Doc. No. 318-2, ¶ 2(c).

[47] Trial Tr. 135:2 – 17; 139:19 – 140:2; 394:5 – 396:3. Rossman confirmed this section was added to the Settlement Agreement at Cole's request. Trial Tr. 776:5 – 7.

Settlement Agreement, PRN *did* assume control of C&G Real Estate Group, Inc.[48]

Fred Schaub however made no payments to C&G Real Estate Group, Inc. So, neither

Cole nor PRN received any monies.

PRN now claims Cole misrepresented C&G Real Estate Group, Inc.'s

entitlement to the Schaub Obligations to "trick" PRN into signing the Settlement

Agreement. This argument fails on several grounds.

First, the language in paragraph 2(c) of the Settlement Agreement is clear—

Schaub had no legal obligation to pay C&G Real Estate Group, Inc. a dime:

> i. Cole, Goldberg and Fred Schaub have been business partners for many years. Over the last several years, Schaub and certain Arlington Entities experienced cash-flow problems. Cole and Goldberg and/or C&G Real Estate Group, Inc. advanced funds to Schaub and *certain* Arlington Entities. It is *estimated* that $980,000 of those funds has not been repaid and remain outstanding as further described on Exhibit A, item 20(c).

> ii. The agreement between the parties (i.e. Cole, Goldberg, and Schaub) is that Schaub would pay (as he has done in the past) 25% of monies received by certain Arlington Entities (net of costs as the costs categories are agreed to by the parties for that particular deal). *The agreement set forth above has not always been strictly adhered to and is not in writing.*[49]

---

[48] Trial Tr. 140:8 – 141:9. PRN, through a designee corporation, purchased C&G Real Estate Group, Inc.'s stock after a public sale under a stock pledge. Therefore, PRN's designee would retain the right to 50% of any payment of the Schaub Obligations.

[49] PRN Ex. 2, Adv. Doc. No. 318-2, Ex. A, ¶ 2(c) (emphasis added).

Nowhere in paragraph 2(c) does Cole represent that Fred Schaub or his entities owed a debt to him or to C&G Real Estate Group, Inc. No specific corporate obligor is identified. No terms—such as periodic payment amounts, an interest rate, or maturity date—are identified. No specific debt is mentioned, although it is "estimated" that Cole, Goldberg, or C&G Real Estate Group, Inc. may have advanced $980,000 to some unidentified entities, which has not been repaid.

Although paragraph 2(c) provides that "Fred Schaub would pay 25% of monies received by [unidentified] Arlington Entities (net of costs as the costs categories are agreed to by the parties for that particular [unidentified] deal)," the same paragraph expressly acknowledges that the agreement is not in writing and that the parties have not always "strictly adhered" to it. Lest there be any doubt there is no legally enforceable agreement between Cole and Schaub, section 20(c) of Exhibit A to the Settlement Agreement further confirms that any repayment obligation by Schaub is *discretionary* and *legally unenforceable* "as agreed to by the parties due to the desire to keep the Arlington Entities cash flowing and/or solvent."

Rossman is a sophisticated lender. During her testimony, it was clear she is very competent and able to parse this language for what it was: a "hope" that Schaub would repay Cole, Goldberg, or C&G Real Estate Group, Inc. some of the $980,000 they advanced to him and his companies during the hot real estate market between 2000 and 2008. But no reasonable businessperson would interpret this language as a legal obligation to repay any monies. PRN hoped to get $490,000 from Schaub. So did Cole. Schaub, however, made no such payments.

But that does not mean Cole affirmatively misrepresented his agreement with Schaub. Cole testified that the language in paragraph 2(c) accurately reflected his loose agreement with his friend. Cole *hoped* Schaub would help him and Goldberg recoup some of their losses when he got paid on future deals. But this was never more than "a moral obligation."[50] And, if any payments were made, Cole hoped to keep 50% of the monies and share 50% with PRN.

Putting aside there was no misrepresentation, PRN could not have justifiably relied on the abstruse language in paragraph 2(c) of the Settlement Agreement to demonstrate any deception by Cole. The provision contained no definitive terms or details typically associated with a legally enforceable debt obligation. Before signing the Settlement Agreement, PRN never asked Cole to supply any financial statements, financial disclosures, or additional information explaining the Schaub Obligations.[51]

Rossman confirmed the loose nature of Schaub's hope to repay Cole's advances in an email she sent to Cole on April 26, 2012, about one month before signing the Settlement Agreement:

> Fred confirmed to me that the debt Arlington has is to C&G Real Estate…I assume it will be shown on C&G Real Estate tax return and of course recorded on Arlington's.[52]

---

[50] Trial Tr. 130:16 – 21; 134:2 – 135:17; 138:4 – 13; 372:11 – 373:3; 392:25 – 394:4; 658:6 – 11.

[51] Trial Tr. 398:3 – 21.

[52] Cole Ex. 203, Adv. Doc. No. 312-28; Trial Tr. 788:20 – 791:4.

But she did not ask to see either return. No prudent, objective lender could justifiably rely on the language in the Settlement Agreement to conclude that Schaub or one of his entities would pay any monies to Cole or C&G Real Estate Group, Inc.

PRN failed to prove its fraudulent inducement claim under § 523(a)(2)(B). Cole made no actionable misrepresentations regarding the Schaub Obligations. Thus, PRN failed to prove that any debt Cole owed it is nondischargeable under Bankruptcy Code § 523(a)(2)(B). Cole is entitled to judgment in his favor on Count 2.

## IV.    The Court will liquidate PRN's claim in the main bankruptcy case (Count 7).

Cole undisputedly owed PRN a lot of money when he filed this bankruptcy case. Cole's debt to PRN, however, was not liquidated as of the petition date. In Count 7, PRN asked the Court to liquidate PRN's claim. But PRN proved no specific amount due by Cole.

PRN filed a proof of claim for $17,342,863.85.[53] Rossman testified that she would "agree" to an overall debt due to PRN of $14,919,632.63.[54] PRN, however, provided no documentation supporting that amount. Although the Court determines that Cole is liable to PRN for some substantial amount, the Court still needs to liquidate the *exact* amount due for distribution purposes.

---

[53] PRN Ex.223, Adv. Doc. No. 326-3.

[54] Trial Tr. 871:6 – 874:17.

PRN requested that the Court liquidate its claim in this proceeding only if the Court determined that the debt owed to PRN was nondischargeable.[55] Because the Court has determined the debt owed to PRN is dischargeable, the parties agree that the Court can liquidate PRN's claim in the main bankruptcy case when it rules on Cole's pending claim objection.[56] Count 7 is therefore moot.

## V.    PRN failed to prove Cole concealed assets intending to hinder, delay, or defraud creditors under §§ 727(a)(2)(A) & (B) (Counts 8 and 9).

In Counts 8 and 9, PRN primarily points to two actions by Cole—one taken before the bankruptcy was filed and one taken after—that it says warrant denying Cole his discharge under § 727(a)(2)(A) and (B).[57] First, shortly before he filed this

---

[55] *Pl.'s Reply to Def.'s Resp. to Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 500, at 2.

[56] *Id.* ("The determination of the amount of the claim should be part of the claim resolution process in the main bankruptcy case."); *William W. Cole, Jr.'s Resp. to Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 496, at 2 ("Liquidation of Plaintiff's claim(s) should be determined in the main case, in which claim objections are pending.").

[57] In its complaint, PRN raises a third action by Cole: failing to disclose the existence of Cole of Orlando Limited Partnership and W&T Cole, LLC in response to Question 18 on his Statement of Financial Affairs ("SOFA"). *Third Am. Compl.*, Adv. Doc. No. 230, at ¶ 205. Cole's failure to disclose Cole of Orlando and W&T Cole also was asserted as a basis for PRN's § 727(a)(4)(A) false oath claim [Count 11]. Although it goes without saying that a debtor's failure to disclose an asset on his SOFA can give rise to a § 727(a)(4)(a) claim, at least one court has held that it also can give rise to a claim under § 727(a)(2)(B) for "concealing" property of the estate. *In re Scott*, 172 F.3d 959, 967 – 68 (7th Cir. 1999); 6 *Collier on Bankruptcy* ¶ 727.02[6][b] (16th ed. 2020) ("In *Peterson v. Scott (In re Scott)*, the Court of Appeals for the Seventh Circuit held that concealment of assets can occur through omission of information from a chapter 11 disclosure statement as well as concealment through omission from the schedules."). The benefit to bringing the claim under § 727(a)(2)(B) is that, unlike a § 727(a)(4)(A) claim, a creditor need only prove the debtor hindered or delayed the administration of a case—not that he acted with fraudulent intent. But the creditor still must prove the debtor *intentionally* withheld (i.e., concealed) the information from his schedules. *In re Scott*, 172 F.3d at 968 (explaining that "the *intentional* withholding of relevant information is not sanctioned by the Bankruptcy Code") (emphasis added). Because, as discussed in Part VI.E.2 of this Memorandum Opinion, which deals with PRN's § 727(a)(4)(A) claim, the Court finds that Cole did not intentionally omit Cole of Orlando and W&T Cole from his SOFA, PRN has failed to prove Cole intentionally withheld or concealed information. Cole's failure to disclose those entities does not give rise to a § 727(a)(2)(B) claim.

bankruptcy case, Cole subdivided his homestead property into two parcels, claiming the more valuable parcel as exempt. PRN argues that by failing to disclose that the two parcels had been one contiguous parcel prepetition, Cole concealed property from the Chapter 7 Trustee. Second, shortly after Cole filed this bankruptcy case, he received payments totaling roughly $1 million from his operating company, Coledev LLC. PRN argues these amounts were for repayment of shareholder loans. But, according to PRN, Cole concealed the "shareholder loans" from the Chapter 7 Trustee and his creditors by treating his advances to Coledev as undisclosed equity contributions. The Court concludes that neither action by Cole warrants denying him his discharge under § 727(a)(2)(A) or (B).

Under § 727(a)(2), a debtor may be denied a discharge if, intending to hinder, delay, or defraud his creditors, he transfers or conceals property within one year before filing for bankruptcy or if he transfers property of the estate after filing for bankruptcy:

> The court shall grant the debtor a discharge, unless…the debtor, with intent to hinder, delay, or defraud a creditor…has transferred…or concealed…property of the debtor, within one year before the date of the filing of the petition; or property of the estate, after the date of the filing the petition….[58]

For the Court to deny a debtor his discharge under § 727(a)(2)(A), the party objecting to the debtor's discharge must show that the act complained of: (1) was done within one year before the petition date; (2) was done with actual intent to hinder,

---

[58] 11 U.S.C. § 727(a)(2)(A) & (B).

delay, or defraud a creditor, (3) was done by the debtor, and (4) consisted of transferring, removing, destroying, or concealing the debtor's property.[59] The elements for a claim under § 727(a)(2)(B) are identical, except that the party objecting to the debtor's discharge must show that the debtor fraudulently transferred or concealed property *after* the bankruptcy case was filed.

To determine whether a debtor *fraudulently* intended to transfer or conceal property before or after the petition date, courts can consider the debtor's actions and circumstantial evidence, including the traditional "badges of fraud." Badges of fraud, which are strong indicators of fraudulent intent, include: (1) the lack or inadequacy of consideration for the property transferred; (2) a family or close relationship between the parties; (3) whether the transferor retained possession, control, use, or the benefit of the transferred property; (4) the transferor's financial condition before and after the transfer; (5) the cumulative effect of the transaction and course of conduct after the onset of financial difficulties or threat of suit; and (6) the general chronology and timing of events.[60]

---

[59] *Jennings v. Maxfield (In re Jennings)*, 533 F.3d 1333, 1339 (11th Cir. 2008); *see also Caterpillar, Inc. v. Gonzalez (In re Gonzalez)*, 302 B.R. 745, 752 (Bankr. S.D. Fla. 2003) (explaining that "[i]n order to prevail against the Debtor on its § 727(a)(2)(A) claim, the Plaintiff must prove two things: (a) assets of [the Debtor] were transferred, removed, destroyed, mutilated, or concealed, and, if proven, (b) that the Debtor had an intent to hinder, delay, or defraud his creditors.").

[60] *Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 121 – 22 (M.D. Fla. 1991).

PRN must prove its § 727(a)(2)(A) and (B) claims by a preponderance of the evidence.[61] PRN failed to meet its burden of proof because PRN failed to prove that Cole concealed property by subdividing his homestead or by fraudulently characterizing shareholder loans as equity contributions.

### A.    Cole did not conceal property by subdividing his homestead prepetition.

In 2001, Cole and his wife, Terre, bought 2.95 acres of lakefront property in Maitland, Florida.[62] Part of the land was submerged. They built a massive 10,000-square-foot home on the dry land, along with a dock and a boathouse.[63] On June 5, 2015, just weeks before Cole filed for bankruptcy, he and his wife signed a deed dividing the 2.95 acres into two parcels: .765 acres of *Improved Land* containing the home, dock, and boathouse; and 2.185 acres of *Unimproved Land* with no road access and mostly submerged lake property.

When Cole filed for bankruptcy, he listed both the Improved and Unimproved Land on his schedules. Cole valued the Improved Land at $2.5 million;[64] the

---

[61] *In re Jennings*, 533 F.3d at 1339 ("A party who objects to a discharge has the burden to prove the objection by a preponderance of the evidence.") (citing *Grogan v. Garner*, 498 U.S. 279, 289 – 91 (1991)).

[62] PRN Ex. 205, Adv. Doc. No. 325-35. Title to the property was in the name of William W. Cole, Jr. and Theresa Laura Cole, Co-Trustees of the William W. Cole, Jr. Family Trust, dated September 18, 1997, as amended and restated on the 5th day of June 2002.

[63] This summary is paraphrased from the district court's decision affirming Judge Jackson's decision on the Chapter 7 Trustee's objection to Cole's claimed exemption of his home. *Cole v. Patton, et al.*, Case No. 6:19-cv-00699-PGB, Doc. No. 38 at 1 – 3.

[64] PRN Ex. 209, Adv. Doc. No. 325-39, at 4 – 5.

Unimproved Land was valued at $1,000. Cole claimed the Improved Land as exempt homestead.[65]

PRN and the Chapter 7 Trustee objected to Cole's subdivision of the 2.95-acre parcel into .765 acres of Improved Land and 2.185 acres of Unimproved Land as a blatant attempt to reduce the size of the parcel to keep it within the Florida Constitution's one-half-acre limit on homestead property, which would allow Cole to exempt (and therefore keep) the valuable bit and relinquish the worthless remainder to his bankruptcy estate.[66] After much litigation, on April 4, 2019, Bankruptcy Judge Jackson partially sustained the objections to Cole's homestead exemption.[67] Judge Jackson's ruling allowed the Chapter 7 Trustee to ignore the "illegal lot split" and convey the entire 2.95 acres to a third-party buyer, while allowing Cole to exempt 16.9% (.5 acres out of the total 2.95 acres) of the proceeds.

The Trustee later sold the house to a third party for $2,250,000,[68] which is close to the $2.5 million estimated value Cole listed on his schedules. Because the Trustee sold the entire 2.95 acres, the estate received the same amount it would have received

---

[65] *Id.*

[66] *Objection to Debtor's Claimed Homestead Exemption*, Case No. 6:15-bk-06458-KSJ, Doc. No. 104; *Objection to Debtor's Claim of Homestead Exemption*, Case No. 6:15-bk-06458-KSJ, Doc. No. 116.

[67] *Memorandum Decision Sustaining, In Part, Objections to Debtor's Claim of Exemption*, Case No. 6:15-bk-06458-KSJ, Doc. No. 788; *Order Sustaining, In Part, Objections to Debtor's Claim of Exemption*, Case No. 6:15-bk-06458-KSJ, Doc. No. 791. On December 20, 2019, the district court affirmed Judge Jackson's ruling. *Cole v. Patton, et al.*, 6:19-cv-00699-PGB, Doc. No. 38. The Eleventh Circuit, as discussed below, has since affirmed the district court. *Cole v. PRN Real Estate & Invs., Ltd.*, 2020 WL 5784873, at *6 (11th Cir. Sep. 29, 2020).

[68] *Joint Motion and Stipulation Regarding Sale of Homestead Property*, Main Case No. 6:15-bk-06458-KSJ, Doc. No. 623; *Order Granting Joint Motion and Stipulation Regarding Sale of Homestead Property*, Main Case No. 6:15-bk-06458-KSJ, Doc. No. 632; Trial Tr. 1372:5 – 21.

if Cole had never subdivided the 2.95-acre parcel. Even so, PRN claims Cole should not receive a discharge because he engaged "in a scheme to conceal the value of the Property by making it appear that the alleged homestead property" was limited to the Improved Land.[69] PRN contends Cole concealed property—and therefore may not have a discharge—because he did not indicate that the 2.95 acres of land was one contiguous parcel until shortly before the bankruptcy filing.

To be sure, Cole's attempt to subdivide the 2.95 acres was misleading. The Eleventh Circuit Court of Appeals said as much—upholding a finding that Cole "misleadingly manipulated his homestead exemption"—in affirming a district court order upholding Judge Jackson's original ruling.[70] Still, I find PRN cannot prevail on its § 727(a)(2)(A) claim because PRN failed to prove that Cole concealed anything.

To "conceal" requires a debtor to hide an interest in property yet continue to reap the benefits of ownership.[71] Here, Cole publicly disclosed both the Improved Land and the Unimproved Land on his schedules. And he told the Chapter 7 Trustee about the subdivision of the 2.95-acre parcel the first time he met her.[72] So Cole did not conceal the property or the fact that he subdivided it.

Even if one could reword the statue to provide that a debtor could lose a discharge because he concealed the "value" of an asset while still fully disclosing it,

---

[69] *Pl.'s Post-Trial Brief*, Adv. Doc. No. 435 at 4.

[70] *PRN Real Estate & Invs.*, 2020 WL 5784873, at *5 – 6.

[71] *Johnson v. Greene (In re Greene)*, 340 B.R. 93, 98 (Bankr. M.D. Fla. 2006).

[72] Trial Tr. 1368:12 – 1369:8.

Cole did not conceal the 2.95-acre parcel's value. He estimated the value for both the Improved Land and Unimproved Land at $2,501,000, which is close to the price it sold for three years later ($2,250,000).

Because PRN failed to prove that Cole transferred or concealed property within one year before filing for bankruptcy, PRN cannot prevail on its § 727(a)(2)(A) claim. Cole is entitled to judgment in his favor on Count 8.

### B.    Cole did not conceal assets by characterizing advances to Coledev, LLC as equity contributions rather than shareholder loans.

Cole founded Coledev LLC on October 3, 2012.[73] He and his wife own 99% of the company as tenants by the entireties. His son, Adam, owns the remaining 1%. Cole disclosed the creation of Coledev, which was the primary operating business entity he used from 2012 onwards, to PRN before it was legally formed.[74] From Coledev's inception, Cole "made millions of dollars of advances" to the company.[75]

In reviewing three years of Coledev's daily accounting entries, it is apparent monies freely flowed *between* Cole and Coledev, often in large amounts. Cole would make large advances to and then receive large payments from Coledev, likely when projects were completed. For example, in 2013, shareholders advanced $751,400 to

---

[73] PRN Ex. 154, Adv. Doc. No. 324-49.

[74] Trial Tr. 478:21 – 481:19; Cole Ex. 101, Adv. Doc. No. 309-1.

[75] Adv. Doc. No. 435 at 7 – 8; PRN Ex. 41, Adv. Doc. No. 320-10, at 27; PRN Ex. 42, Adv. Doc. No. 320-11, at 64 – 65; PRN Ex. 43, Adv. Doc. No. 320-12, at 44 – 45.

Coledev; that same year, shareholders received distributions totaling $209,400. This same pattern continued in 2014 and 2015.

On July 26, 2015, the day before this bankruptcy case was filed, financial records show Coledev had a balance due to shareholders of $1,018,544.92.[76] After the bankruptcy was filed, Cole stopped advancing money to Coledev. But shareholders continued to receive more than $1 million in post-petition distributions.[77] By December 31, 2015, Coledev's account labeled "shareholder loans payable" showed a balance due to shareholders of $17,669.08.

Cole testified the advances he made to Coledev were capital contributions.[78] Cole's testimony was bolstered by the fact that no promissory notes exist;[79] no interest accrued;[80] and Coledev's 2012 and 2013 federal tax returns reflect that the monies Cole advanced to Coledev were "additional paid-in capital."[81] And on June 30, 2015, less than one month before he filed for bankruptcy, Cole gave American Momentum Bank

---

[76] PRN Ex. 43, Adv. Doc. No. 320-12, at 45. PRN argues these distributions necessarily constitute property of this bankruptcy estate. But that is not accurate. Cole claimed his ownership interest in Coledev exempt because he and his non-filing spouse jointly own 99% of the company as tenants by the entireties. If accurate, and no joint creditors exist, the distributions would *not* be property of the estate.

[77] *Id.* The exact amount is $1,005,952.84. But it appears that some portion of these distributions may have been for reimbursements or paid to Adam Cole, Cole's son and 1% owner of Coledev.

[78] Trial Tr. 272:4 – 16; 272:9 – 12; 283:4 – 22; 304:22 – 307:5; 318:11 – 327:17.

[79] Trial Tr. 319:19 – 22; 321:3 – 12.

[80] Trial Tr. 319:23 – 320:3; 321:17 – 19.

[81] Cole Ex. 141, Adv. Doc. No. 311-1, at 7; Cole Ex. 142, Adv. Doc. No. 311-2, at 8; Trial Tr. 319:2 – 8; 320:9 – 23.

copies of Coledev's 2013 and 2014 financial statements, which showed no shareholder loans by Cole to Coledev.[82]

When Cole filed for bankruptcy, he accurately disclosed his 99% membership interest in Coledev on Schedule B and noted it was jointly owned with his wife as tenants by the entireties with an undetermined value.[83] PRN argues this disclosure is inadequate because, in PRN's view, Cole's millions of dollars in advances to Coledev were really shareholder loans that should have been separately disclosed on his schedules as "shareholder loans payable."

In support of its argument that the advances really were shareholder loans and not capital contributions, PRN relies on Coledev's accounting records, kept using QuickBooks software, treating the advances as "shareholder loans payable." And PRN highlights Coledev's 2014 and 2015 federal tax returns, filed after September 15, 2015, which treat the advances as shareholder loans for the first time.[84] PRN also notes Coledev's Operating Agreement requires capital contributions to be made in proportion to each member's interest. Because Cole kept making advances while his wife and son, Adam Cole (a 1% member), did not, PRN argues that the membership percentages should have shifted if the advances were capital contributions.[85] But the

---

[82] Cole Ex. 193, Adv. Doc. No. 312-18, at 8.

[83] PRN Ex. 209, Adv. Doc. No. 325-39, at 7.

[84] PRN Ex. 252, Adv. Doc. No. 352-1, at 9; PRN Ex. 253, Adv. Doc. No. 352-2, at 8.

[85] PRN Ex. 154, Adv. Doc. No. 324-49, at 5 – 6, §§ 3.3 & 3.8.

membership interests were never altered. Finally, PRN notes that Mrs. Cole testified that she believed the advances were shareholder loans, not capital contributions.[86]

Let's put PRN's argument in context. Everyone agrees that Coledev was Cole's primary operating company starting in 2012; Cole owns 99% of the shares as a member jointly with his wife as tenants by the entireties; substantial monies (in the millions of dollars) flowed freely between Cole and Coledev; and, after this bankruptcy case was filed, shareholders received a little more than $1 million in distributions. It is also undisputed that Coledev's federal tax returns for 2012 and 2013 reflect Cole's advances to Coledev as capital contributions, while Coledev's 2014 and 2015 federal tax returns, filed months after the bankruptcy, treat the advances as shareholder loans, as do the company's QuickBooks financial records.

However, the advances were characterized, Cole disclosed his ownership interest in Coledev in his schedules as jointly owned with his wife as tenants by the entireties.[87] So all parties knew of his ownership interest. The only issue is whether

---

[86]Terre Cole Dep., Adv. Doc. No. 403-2, 178:11 – 25.

[87] The Chapter 7 Trustee objected to Cole's exemption of his TBE ownership interest in Coledev. *Objection to Debtor's Claim of Exemptions (tenancy by entireties claim)*, Doc. No. 115. That objection appears to be unresolved. PRN also is trying to prove a claim against Terre Cole in the pending state court action, which could establish a joint claim by PRN against Cole and his wife, allowing PRN to collect the joint claim against property Cole and his wife own as tenants by the entireties, including Coledev. *In re Cooper*, 2018 WL 11206027, at *2 (Bankr. M.D. Fla. Aug. 13, 2018) ("Under Florida law, property held as TBE belongs to neither spouse individually. As a result, TBE property 'is exempt from process to satisfy debts owed to individual creditors of either spouse.' TBE property, however, 'is not exempt from process to satisfy *joint debt* of both spouses.'"); *In re Daniels*, 309 B.R. 54, 56 (Bankr. M.D. Fla. 2004) ("Accordingly, property held as tenants by the entirety can only be reached to satisfy a husband and wife's joint debts and cannot be reached to satisfy the obligations of only one spouse."). And, as requested by the Chapter 7 Trustee in pending Adversary Proceeding No. 17-ap-112, Coledev's post-petition distributions to its members as "shareholder loans" could be property of this bankruptcy estate and subject to turnover. The Court, however, need not resolve any of these open

Cole, by *classifying* his interest as solely equity based on capital contributions instead of as "shareholder loans payables," concealed property of the bankruptcy estate intending to hinder, delay, or defraud his creditors. I find he did not.

At trial, there was a battle of the experts arguing that the contributions were capital infusions or loans.[88] These experts, whose testimony I considered and will admit, are highly esteemed professionals who can expertly opine about what constitutes a capital contribution versus a shareholder loan. But, in the end, it makes no difference whether Coledev treated the advances as capital contributions or as shareholder loans because in a closely held corporation those labels are often meaningless.[89]

That's why when the Trustee became aware of the "shareholder loan" versus "capital contribution" issue after receiving Coledev's 2014 and 2015 federal tax returns,[90] she was not troubled by Cole's use of the equity label. The Trustee believed,

---

issues relating to the "shareholder loans" in determining whether Cole is entitled to receive a discharge.

[88] Susan M. Smith testified as PRN's expert. Trial Tr. 1040:15 – 1202:23. Robert B. Morrison testified as Cole's expert. Trial Tr. 1220:6 – 1366:11. Each party has objected to the other party's expert. Adv. Doc. Nos. 353, 369 & 370; Trial Tr. 748:2 – 753:10; 1041:3 – 5; 1215:23 – 1219:5; 1256:17 – 1258:1. I will overrule both parties' objections and consider the expert testimony of both Ms. Smith and Mr. Morrison. PRN's Second Amended Motion to Exclude Expert Testimony of Robert Morrison (Adv. Doc. No. 353) is denied.

[89] *See, e.g., Truett v. Dep't of Revenue*, 2018 WL 1306645 (Or. T.C. March 13, 2018) (explaining that the "distinction between a shareholder loan and a capital contribution rests on the question of 'whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship'" and that "[i]n a closely held corporation, the labels applied to the transaction by the shareholder and in the company's books 'lose their meaningfulness' because 'the same persons occupy both sides of the bargaining table'") (quoting *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968)) (alteration in original) (citation omitted).

[90] Trial Tr. 1377:19 – 21.

based on what her own professionals told her, that the distinction between "shareholder loans" and "capital contributions" is, as a practical matter, a distinction without a difference because those terms are often interchangeable in the real world:

> In a nutshell, she said that when you have situations similar to this that it's not unusual for a chunk of money to be labeled equity one day or capital account one day or whatever and shareholder loan the next and that they are interchangeable, and it is completely up to the company's principals.[91]

Just like any operating company, a non-debtor business continues to operate after a shareholder files for bankruptcy. Even small, closely held companies, like Coledev, operate post-bankruptcy. The Chapter 7 Trustee knew about Coledev, could inquire as to the status of its operations, and, if appropriate, object to Cole's claimed TBE exemption of Coledev, which she did.[92] Indeed, the Chapter 7 Trustee confirmed Cole was cooperative and supplied all the information and documents she requested.[93]

PRN has failed to demonstrate that by characterizing his advances to Coledev as capital contributions rather than shareholder loans, Cole concealed any property

---

[91] Trial Tr. 1377:8 – 15. PRN complains that Judge Jackson acknowledged that the Trustee's testimony regarding what her professionals told her is hearsay. *Pl.'s Resp. Pursuant to Order Permitting Parties to Identify Errors in Prelim. Memorandum Opinion*, Adv. Doc. No. 495, at 7. This is not so. Judge Jackson allowed the Trustee's testimony over PRN's hearsay objection and indicated she later would decide whether to give the testimony any weight. I conclude the testimony is admissible, not for the truth of the matter of what the Trustee's expert said, but rather because it goes to the Trustee's state of mind. She simply did not find it significant that Cole did not disclose the debt as a shareholder loan versus a capital contribution. It did not affect her administration of this case.

[92] Main Case No. 6:15-bk-6458-KSJ, Doc. No. 115.

[93] Trial Tr. 1370:9 – 20.

after this bankruptcy case was filed intending to hinder, delay, or defraud his creditors under §727(a)(2)(B). Cole is entitled to judgment in his favor on Count 9.

## VI. PRN failed to prove Cole made any "false oaths" under § 727(a)(4)(A) (Count 11) that would prevent him from receiving a discharge.

In Count 11, PRN alleges Cole failed to disclose assets on his bankruptcy schedules and Statement of Financial Affairs ("SOFA"). PRN asserts that Cole materially misstated his income on Schedule I; materially misstated the value of his interest in CRS Costa, Inc.; materially misstated his ownership interest in Coledev, LLC; and fraudulently omitted 29 business entities on his SOFA, including Cole of Orlando.[94] PRN also contends that Cole fraudulently made false oaths regarding his homestead.[95]

Chapter 7 debtors "have an unconditional, absolute obligation to make full disclosure of all matters relevant to the administration of the estate."[96] As Chief Judge Delano observed in *In re Peckham*, "the bankruptcy schedules and statement of financial affairs do not ask the debtor and debtor's counsel to make assessments of what they think is important; instead, a debtor must fully, completely, honestly, and accurately list all assets, creditors, and financial affairs."[97] "Policy considerations

---

[94] PRN Ex. 209, Adv. Doc. No. 325-39; PRN Ex. 210, Adv. Doc. No. 325-40.

[95] *Pl.'s Resp. Pursuant to Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 495, at 2 – 4.

[96] *Heidkamp v. Whitehead* (*In re Whitehead*), 278 B.R. 589, 594 (Bankr. M.D. Fla. 2002) (emphasis added).

[97] *In re Peckham*, 2013 WL 5984467, at *4 (Bankr. M.D. Fla. Nov. 12, 2013).

mandate that the requirement to list all assets and liabilities is an absolute obligation of those seeking discharge of their debts."[98]

Failure to disclose—or materially misstating the value of—assets constitutes a false oath, which is a basis for denying a debtor his or her Chapter 7 discharge.[99] Bankruptcy Code § 727(a)(4)(A) provides that a debtor may be denied a discharge if he or she "knowingly and fraudulently. . . made a false oath or account" in connection with a case.[100] To warrant denial of a discharge based on a debtor's false oath, the objecting party must prove the false oath was (1) fraudulently made; and (2) material.[101]

Fraudulent intent usually is inferred by examining the totality of circumstances surrounding the debtor's bankruptcy case.[102] A fact is "material," and failing to disclose it sufficient to bar a debtor's discharge, "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[103]

---

[98] *In re Whitehead*, 278 B.R. at 594.

[99] *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991) ("Deliberate omissions by the debtor may also result in the denial of a discharge" under § 727(a)(4)(A).") (quoting *Chalik v. Moorefield*, 748 F.2d 616, 618 (11th Cir. 1984)); *Whigham v. United Asset Holdings Residential, LLC (In re Whigham)*, 770 F. App'x 540, 545 – 46 (11th Cir. 2019) (unpublished decision).

[100] 11 U.S.C. § 727(a)(4)(A).

[101] *Protos v. Silver (In re Protos)*, 322 F. App'x 930, 933 (11th Cir. 2009) (unpublished decision); *Swicegood v. Ginn*, 924 F.2d at 232.

[102] *Phillips v. Epic Aviation (In re Phillips)*, 476 F. App'x 813, 816 n.1 (11th Cir. 2012) (unpublished decision); *Meininger v. Khanani (In re Khanani)*, 374 B.R. 878, 888 (Bankr. M.D. Fla. 2005) (explaining that the "requisite intent may be established by the objecting party through inference from the facts") (citing 6 Collier on Bankruptcy ¶ 727.04[1][b]).

[103] *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984).

### A.    Cole accurately disclosed his prepetition income.

On his Schedule I, Cole lists $3,500 in monthly gross wages, plus $433 per month in dividend income, resulting in annual gross wages and dividend income of $47,196.[104] In response to Question 1 on his SOFA, Cole lists $0 in income from employment in 2013 and $35,000 in employment income in 2014. PRN asserts that Cole materially misstated his income on his Schedule I and SOFA because he had substantially more income in 2013 and 2014.

PRN bases its argument on Cole's 2013 and 2014 federal tax returns, which show $360,517 in gross income for 2013 and $1,042,362 in gross income for 2014.[105] PRN also points to a financial statement Cole gave to Ally Bank in connection with a car lease listing his gross income at $475,000.[106]

Cole, however, says PRN is comparing "apples to oranges." On the one hand, Cole's 2013 and 2014 tax returns, and the financial statement he gave Ally Bank, show Cole's overall "income" in 2013 and 2014. But Schedule I and Cole's answer to SOFA Question 1 both ask for more limited information about Cole's "employment income" or "gross wages or salary." PRN's argument is almost ridiculous insofar as it fails to distinguish between gross income versus wages, particularly when most of Cole's income is derived from profits earned on successful real estate deals—not wages.

---

[104] PRN Ex. 209, Adv. Doc. No. 325-39, at 21 – 22.

[105] PRN Ex. 36, Adv. Doc. No. 320-5, at 5; PRN Ex. 37, Adv. Doc. No. 320-6, at 5; Trial Tr. 221:2 – 222:12; 223:21 – 224:15. PRN ignores the $7 plus million carry forward loss claimed by Cole in tax years 2013 and 2014.

[106] PRN. Ex. 238, Adv. Doc. No. 326-18. The financial statement is dated March 6, 2015.

Contrary to PRN's claim, Cole accurately and consistently listed his actual *salary or wages* from Coledev in 2013 and 2014 on his tax returns and his bankruptcy filings.[107] Cole listed $0 in wages from Coledev on both his 2013 tax return[108] and in response to SOFA Question 1.[109] Cole listed $39,699 in wages from Coledev on his 2014 tax return[110] and $35,000 in response to SOFA Question 1. He estimated $3,500 per month in wages from Coledev for 2015 on his Schedule I.[111] Based on that estimate, Cole would have received roughly $24,500 in wages by the time he filed for bankruptcy in July 2015. In response to Question 1 on his SOFA, Cole confirmed he had received $16,147.50 in wages from Coledev before filing for bankruptcy on July 27, 2015.[112]

Cole's gross income is a vastly different calculation necessitating complex and lengthy tax returns totaling 68 pages in 2013 and 41 pages in 2014. Cole's reference to annual income—as opposed to wages—of $475,000 on a car lease application in March 2015 is entirely consistent with his bankruptcy filings and prior tax returns. Cole accurately reflected his gross wages and employment income in his bankruptcy filings. PRN therefore proved no false oath by Cole relating to this income.

### B.    Cole accurately disclosed his interest in CRS Costa, Inc.

---

[107] Trial Tr. 309:13 – 310:19; 313:19 – 314:17; 315:11 – 317:20.

[108] PRN Ex. 36, Adv. Doc. No. 320-5, at 5, line 7.

[109] PRN Ex. 210, Adv. Doc. No. 325-40, at 2.

[110] PRN Ex. 37, Adv. Doc. No. 320-6, at pg. 5, line 7 & pg. 40.

[111] PRN Ex. 209, Adv. Doc. No. 325-39, at 21.

[112] PRN Ex. 210, Adv. Doc. No. 325-40, at 2.

In 2006, Cole and Rossman (joined by her sisters) embarked on a large real estate project in Costa Rica, forming CRS Costa, Inc. as the corporate entity for the project. Cole owned a 46.33% interest in CRS Costa, Inc.[113] When he filed for bankruptcy, Cole listed his interest in CRS Costa, Inc. as having a value of $0.[114]

Recently, the Chapter 7 Trustee tried to sell Cole's interest in CRS Costa, Inc. to PRN for $10,000.[115] Cole objected, contending CRS Costa, Inc. was worth more than $10,000.[116] And during settlement discussions with the Chapter 7 Trustee, Cole apparently claimed his interest in CRS Costa, Inc. was worth more than $10,000, though no proof of any specific higher valuation exists.[117]

PRN did not allege in its Third Amended Complaint that Cole materially misstated the value of CRS Costa, Inc.[118] Rather, PRN appears to have surprised Cole at trial with this assertion, perhaps to gain leverage to encourage the Chapter 7 Trustee to sell Cole's interest in CRS Costa, Inc. to PRN for the nominal sum $10,000. Because

---

[113] For background information, see the *Summary Prepared by Nancy A. Rossman for Sale of Interest in CRS Costa, Inc. Stock* filed in the main bankruptcy case. Main Case No. 6:15-bk-06458, Doc. No. 919. The Court makes no factual findings on the accuracy of this information, but it is helpful to glean a general understanding of CRS Costa, Inc.

[114] PRN Ex. 209, Adv. Doc. No. 325-39, at 8; PRN Ex. 210, Adv. Doc. No. 325-40, at 11.

[115] *Motion to Sell Property of the Estate Free and Clear and Adopt Sale and Bidding Procedures*, Main Case No. 6:15-bk-06458, Doc. No. 905.

[116] *Debtor's Limited Objection to Trustee's Motion to Sell Property of the Estate Free and Clear*, Main Case No. 6:15-bk-06458, Doc. No. 910.

[117] Trial Tr. 1422:8 – 1426:6.

[118] *Third Am. Compl.*, Adv. Doc. No. 230.

the Court does not condone these surprise tactics, I will disregard any testimony relating to the valuation of Cole's interest in CRS Costa Inc.[119]

Even if I did consider the testimony, however, I easily conclude that Cole made no false oath. CRS Costa was a massive project in Costa Rica that started in 2006—nearly a decade before Cole filed this bankruptcy case. It remains unfinished, and it is encumbered by substantial debt, which was incurred to pay development costs, like installing water and other improvements.[120] Cole has not been directly involved in the project since at least 2014, though he recently requested additional financial information on the status of the project. Given all this, his estimate of a $0 value for his stock is reasonable and in no way deceived or discouraged the Chapter 7 Trustee from administering the asset. PRN proved no false oath by Cole relating to the value of CRS Costa.

## C.    Cole accurately disclosed the value of Coledev, LLC.

In his schedules, Cole claimed the value of his operating company, Coledev, LLC, was "undetermined."[121] PRN argues this is a false oath because Cole had given American Momentum Bank a financial

---

[119] Specifically, Cole requests the Court to disregard Rossman's testimony at Trial Tr. 859:6 – 868:14, which is appropriate. The Court will not consider this testimony.

[120] *Summary Prepared by Nancy A. Rossman for Sale of Interest in CRS Costa, Inc. Stock*, Main Case No. 6:15-bk-06458, Doc. No. 919.

[121] PRN Ex. 209, Adv. Doc. No. 325-39, at 7.

statement valuing Coledev at almost $4 million on July 24, 2015,[122] just days before this bankruptcy case was filed. However, Cole testified the value he gave to American Momentum Bank just days before bankruptcy was an estimate of the capital contributions he and his wife made to Coledev—not a valuation of Coledev as a going concern business.[123] That analysis would have taken much longer and would have resulted in a drastically different value. I find Cole's trial testimony on that score credible and convincing. PRN therefore failed to prove Cole made a false oath of the value of Coledev, LLC.**D.  Cole   did   not   misstate   the amount he owes PRN.**

Cole undisputedly owed PRN a lot of money when he filed this bankruptcy case. In his bankruptcy schedules, he listed the amount due to PRN as contingent, unliquidated, and disputed in an "undetermined" amount.[124] PRN contends this is a false oath because Cole represented in the parties' Settlement Agreement he owed PRN more than $30 million.[125] In 2013, Cole again stated he owed a "contingent"

---

[122] PRN Ex. 80, Adv. Doc. No. 323-14, at 5. The exact value listed was $3,985,000. On July 22, 2015, Debtor had given American Momentum Bank an earlier financial statement valuing Coledev at slightly less—$3,242,391. PRN Ex. 77, Adv. Doc. No. 323-11, at 3.

[123] Trial Tr. 323:3 – 326:5.

[124] PRN Ex. 209, Adv. Doc. No. 325-39, at 16.

[125] PRN Ex. 2, Adv. Doc. No. 318-2, at 24 – 25. Debtor also testified in the pending state court action he owed PRN over $30 million. Trial Tr. 73:4 – 75:13.

liability to PRN of $32.8 million.[126] PRN's argument that Cole misstated the debt he owed PRN falls flat for several reasons.

For starters, Cole's statements of the debt due to PRN are dated, having been made at least two years before filing this bankruptcy case. And PRN ignores the $10 million plus that PRN received after June 2012, when the parties completed joint real estate ventures, which would have reduced or at least altered the calculation of the debt.

Most telling, however, is that even Rossman could not accurately liquidate the amount due to PRN. PRN filed Claim 6-1 for $17,342,863.85.[127] She testified that PRN had advanced at least $419,385.33 to Cole after June 2012, but she would "agree" to an overall debt due to PRN of $14,919,632.63.[128] She offered no supporting documentation for this "agreed" debt, although she did examine an unadmitted calculation she prepared.

Cole's likely substantial debt to PRN was not liquidated on the date this bankruptcy case was filed. And it remains unliquidated today. Based on Rossman's testimony alone, the Court would find that Cole accurately listed his debt to PRN as "undetermined," contingent, unliquidated, and disputed. PRN therefore proved no false oath by Cole for the amount he owed PRN.

### E.    Cole's omission of business entities does not prevent him from receiving a discharge.

---

[126] Cole Ex. 193, Adv. Doc. No. 312-18, at 4.

[127] PRN Ex. 223, Adv. Doc. No. 326-3.

[128] Trial Tr. 871:6 – 874:17.

SOFA Question 18 asks individual debtors to list all business interests they had during the six years before filing bankruptcy. The question, which is broad, requires the debtor to include any business in which the debtor was an officer, director, partner, managing executive, or sole proprietor, and any business in which the debtor held 5% or more of the ownership interest. In answer to Question 18, Cole listed 14 such businesses.[129] But, in Exhibit S to its Third Amended Complaint, PRN lists 28 business entities it claims Cole failed to list in response to SOFA Question 18.[130]

**1.    All but two of the entities that Cole failed to disclose did not have to be disclosed and are not material.**

Twenty-six of the entities that Cole failed to disclose either were not material or did not have to be disclosed. They fall into three obvious categories:

1.    ***Community Associations***.[131] Eleven of the entities were community associations. Cole did not believe these non-profit community associations fit the definition of "business."[132] While he likely was an officer or director of some of these associations connected to his on-going projects, he had no pecuniary interest in the associations. The Court finds their inclusion was not required or their omission not material.

---

[129] PRN Ex. 210, Adv. Doc. No. 325-40, at 11.

[130] *Third Am. Compl.*, Adv. Doc. No. 230-6, Ex. S.

[131] *Third Am. Compl.*, Adv. Doc. No. 230-6, Ex. S, Nos. 1, 2, 4 – 8, 12, 13, 23 & 25.

[132] Trial Tr. 330:15 – 333:10.

2.      _**Projects Relinquished to PRN**_.[133] Five of the "omitted" entities were entities that Cole transferred to PRN under the Settlement Agreement. After 2012, he had no further connection to these businesses. Although perhaps Cole should have listed these business entities, the fact is he had no remaining pecuniary interest. The Court finds it is disingenuous for PRN to argue Cole should forfeit his discharge for failing to list companies PRN now owns and controls.

3.      _**Entities Cole Did Not Need to List**_.[134] PRN listed ten business entities that Cole did not have to list in response to Question 18 on his SOFA.

   a.      _Atlanta Heritage Homes, LLC_ (#3) – This is an older joint project with PRN. Cole was not an officer or director, and the project ended in 2008, before the start of the six-year look-back period.

   b.      _Devco RCJ Limitada_ & _RCJ Tambor Limitada_ (## 9 & 10) – Both these entities were owned by CRS Costa, Inc., not Cole. Cole listed his ownership interest in CRS Costa, Inc. in response to SOFA Question 18.

   c.      _Arlington Homes, LLC_ (#18) – This entity was owned in part by C&G Real Estate Group, Inc., not Cole. PRN now controls C&G Real Estate Group, Inc.

   d.      _WC&TC Holdings, Inc._ (#20) – This entity ceased operations in 2003, before the start of the six-year look-back period.

---

[133] _Third Am. Compl._, Adv. Doc. No. 230-6, Ex. S, Nos. 11 & 14 – 17.

[134] _Third Am. Compl._, Adv. Doc. No. 230-6, Ex. S, Nos. 3, 9, 10, 18, 20- 22, 24, 27 & 28.

    e.    *William W. Cole Jr. Family Trust* (#21) – This entity is a family trust, which is not a business entity required to be disclosed in response to SOFA Question 18.

    f.    *S&C Real Property Investments, LLC* (#22) – This entity was owned in part by Coledev, not Cole. Cole listed his ownership interest in Coledev in response to SOFA Question 18.

    g.    *Arlington Realty, Inc.* (#24) – Cole had no interest in this entity.

    h.    *Deer Run CDD Holdings, Inc.* (#27) – Cole had no interest in this entity.

    i.    *Coledev Real Estate, LLC* (#28) – This entity was owned by Coledev, not Cole. Cole listed his ownership interest in Coledev LLC in response to SOFA Question 18.

As to these 26 entities, the Court finds Cole did not need to list the entity, the omission is not material, or the omission was inadvertent. **2.    Cole    did    not fraudulently omit Cole of Orlando Limited Partnership and W&T Cole, LLC.**

The analysis is more complicated as to the two remaining entities—Cole of Orlando Limited Partnership (#29) and its 1% general partner, W&T Cole, LLC.[135] Cole of Orlando, a Nevada corporation, was formed in 2002 to hold Cole and his wife's substantial personal investments. In 2010, Cole decided to close the partnership because the couple allegedly no longer needed a separate (foreign) corporate entity to avoid Florida's intangible tax, which had been repealed, and because the annual

---

[135] W&T Cole, LLC, was duplicated twice on PRN's Exhibit S as Numbers 19 and 26. Cole owned a 49.5% interest in Cole of Orlando Limited Partnership as did Mrs. Cole.

operating costs were too high.[136] In 2011, as part of winding down Cole of Orlando, Cole and his wife transferred nearly $4 million in assets directly from a non-exempt account in the name of Cole of Orlando to themselves as tenants by the entireties.[137]

The existence of an entity that once held—and eventually transferred away—$4 million in investments belonging to Cole is material (i.e., it bears a relationship to Cole's business transactions or estate, or it concerns the discovery of assets or the existence and disposition of his property). The Chapter 7 Trustee acknowledged as much during her testimony.[138] After discovering the $4 million in transfers, the Chapter 7 Trustee sued Cole and his wife in a separate adversary proceeding to avoid and recover Cole's interest in the transfers as fraudulent transfers.[139] In that proceeding, I avoided the transfers to return Cole's interest in them (when quantified) for administration in this Chapter 7 case.[140] So omitting Cole of Orlando in response to SOFA Question 18 is material.[141]

---

[136] Supp. Tr. 56:13 – 57:4.

[137] PRN Exs. 58 – 62, Adv. Doc. Nos. 322-1 – 322-5; Trial Tr. 1064:10 – 1069:16. In 2011, Cole of Orlando transferred $3,968,397.74 to financial accounts owned by Cole and Mrs. Cole purportedly as tenants by the entireties. Debtor had a 49.5% interest in these transferred funds.

[138] Trial Tr.1381:4 – 8

[139] *Lori Patton, as Chapter 7 Trustee v. William W. Cole, Jr., et al.*, Adv. No. 6:17-ap-00112-KSJ, Adv. Doc. No 1.

[140] *Mem. Op. and Order Granting Trustee's Mot. for Partial Summ. J. and Denying Def.'s Mot. for Summ. J.*, Adv. No. 6:17-ap-00112-KSJ, Adv. Doc. No. 92.

[141] Conversely, the omission of W & T Cole, LLC was *not* material. W & T Cole was a 1% member of Cole of Orlando. It never had any assets, was created to comply with Nevada law, and was a mere placeholder without any significance. All the monies were held by Cole of Orlando. Given its non-materiality, no further analysis is needed on whether its omission was intentional or not.

The only question is whether Cole's failure to disclose Cole of Orlando was fraudulent and intentional.[142] At the original trial back in 2018, Cole chalked the omission up to an "inadvertent mistake." Given the importance of this issue, I allowed Cole to testify a second time so he could explain the omission and to allow me to assess his credibility and demeanor.

In his supplemental testimony, Cole suggested the omission of Cole of Orlando occurred because he had an interest in several entities named "Cole of" something, and he says he just "missed it."[143] Cole also offered that his lawyer reviewed the Florida Secretary of State's records to identify all Cole-related entities.[144] Because Cole of Orlando and W&T Cole were Nevada partnerships, however, they were not listed in the Florida records.[145] Cole also pointed out that he listed Cole of Orlando as a co-obligor on his Schedule H, filed on August 10, 2015.[146] To bolster his claim that the omission was inadvertent—rather than intentional and fraudulent—Cole testified that Cole of Orlando had no valuable assets and that he turned over financial records for Cole of Orlando (a K-1, a general ledger, a check from Goldman Sachs, and bank statements) to the Chapter 7 Trustee once the omission was discovered.[147]

---

[142] *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991) ("Deliberate omissions by the debtor may also result in the denial of a discharge" under § 727(a)(4)(A).") (quoting *Chalik v. Moorefield*, 748 F.2d 616, 618 (11th Cir. 1984)); *In re Boone*, 236 B.R 275, 280 (Bankr. M.D. Fla. 1999) (explaining that an omission due to inadvertence or carelessness may not suffice to sustain a claim of false oath).

[143] Supp. Tr. 49:1 – 50:5; 61:5 – 12.

[144] Supp. Tr. 49:1 – 50:5; 61:5 – 18.

[145] Supp. Tr. 49:1 – 50:5; 61:5 – 18.

[146] Supp. Tr. 60:10 – 13; PRN Ex. 209, Adv. Doc. No. 325-39, at 18.

[147] Supp. Tr. 61:19 – 64:14; 77:1 – 16; 94:2 – 95:7.

PRN argues Cole's testimony he "inadvertently" omitted Cole of Orlando is not credible. Cole testified he spent over 150 hours completing his bankruptcy schedules and SOFA.[148] That time included reviewing his 2013 tax return, which was filed in December 2014 or January 2015—just seven months before he filed this bankruptcy case.[149] Cole's 2013 tax return specifically lists Cole of Orlando on its schedules.[150] PRN argues that, given the time Cole spent preparing his schedules and that he specifically reviewed his 2013 tax return, it is unlikely Cole simply forgot to list Cole of Orlando, the entity that previously held Cole's investments totaling more than $4 million. What's more, the Court can't help but notice that, unlike the case with the other entities Cole failed to disclose, Cole had something to gain by omitting Cole of Orlando (i.e., the potential concealment of fraudulent transfers).

Still, in the end, I find that Cole's omission of Cole of Orlando was inadvertent—not intentional. Determining whether a debtor acted intentionally and with fraudulent intent "depends largely upon an assessment of the credibility and demeanor of the debtor,"[151] which is why I asked Cole to testify a second time.

Having observed his demeanor, I found Cole's testimony that he inadvertently omitted Cole of Orlando credible. During his supplemental testimony, Cole was not

---

[148] Trial Tr. 348:2 – 349:9; Supp. Tr. 31:23 – 32:4.

[149] Supp. Tr. 32:5 – 17; 33:9 – 35:19.

[150] PRN Ex. 36, Adv. Doc. No. 320-5, at 28.

[151] *In re Phillips*, 476 F. App'x 813, 816 (11th Cir. 2012) ("Because a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor, deference to the bankruptcy court's factual findings is particularly appropriate.") (quoting *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994)).

evasive. To the contrary, I found him forthright and candid. And his testimony that he had intended to disclose Cole of Orlando, which PRN derided as "self-serving," was largely consistent with the other evidence in the case, particularly his Schedule H.

Cole initially disclosed Cole of Orlando, which had been defunct for several years, on his Schedule H.[152] At his 341 meeting, Cole disclosed the existence of an account (with nominal funds) still held by Cole of Orlando.[153] And at his Rule 2004 exam, which was essentially a continuation of his 341 meeting,[154] Cole produced a thumb drive containing bank statements dating back to 2011 that contained the transfers PRN says Cole was trying to conceal.[155] If he was trying to hide Cole of Orlando, why disclose it on Schedule H?[156] And why voluntarily disclose the account at his 341 meeting?

Cole was not trying to "hide" Cole of Orlando's existence. He simply placed it in the wrong place on his papers. As the Chapter 7 Trustee testified, she would have preferred Cole to also list the entity on SOFA Question 18 rather than only as a co-obligor on Schedule H, but it did not impact her administration of this bankruptcy

---

[152] Supp. Tr. 60:10 – 13; PRN Ex. 209, Adv. Doc. No. 325-39, at 18.

[153] Supp. Tr. 54:21 – 55:12; 74:18 – 75:1. Although Cole disclosed the account, he never mentioned Cole of Orlando during the 341 meeting. Supp. Tr. 75:2 – 6.

[154] Supp. Tr. 88:25 – 89:19. The Rule 2004 exam took place less than three months after the 341 meeting: the 341 meeting of creditors took place on September 2, 2015, Supp. Tr. 73:4 – 23, while the Rule 2004 exam took place on November 17. *Id.*

[155] Supp. Tr. 94:13 – 96:1.

[156] PRN has suggested that Cole may have disclosed Cole of Orlando on Schedule H—and not in response to SOFA Question 18—to "throw a trustee and creditors off track." Based on Cole's demeanor while testifying, coupled with the other evidence in the case, PRN's theory strikes the Court as fanciful, at best.

case.[157] Cole provided the Trustee with information about Cole of Orlando once it was discovered he omitted the entity from his SOFA.[158]

Fraudulent intent usually is inferred from examining the totality of circumstances surrounding the debtor's bankruptcy case. Here, the totality of circumstances proves that Cole inadvertently omitted Cole of Orlando and W&T Cole from his schedules. Based on the totality of circumstances, including Cole's demeanor during his supplemental testimony, which I found credible and believable, I conclude that Cole inadvertently omitted Cole of Orlando and W&T Cole. The transfers from Cole of Orlando to Cole and his wife's TBE accounts were uncovered early on and are now avoided. No party was prejudiced by Cole listing Cole of Orlando *only* on Schedule H and not in response to SOFA Question 18. Nor was the Trustee's job made any more difficult by the omission. PRN failed to prove Cole intentionally and fraudulently omitted Cole of Orlando from SOFA Question 18.

### F.    PRN failed to prove Cole made false oaths regarding his homestead.

In its response to the Court's Preliminary Memorandum Opinion, PRN argued that the Court overlooked three false oaths Cole made regarding his homestead—i.e., Cole scheduled his homestead as two separate parcels when it was really a single contiguous parcel; Cole testified, contrary to his schedules, that the State of Florida owned the 2.185 parcel of Unimproved Land; and Cole testified that the reason he

---

[157] Supp. Tr. 100:12 – 102:1.

[158] Supp. Tr. 61:19 – 64:14; 77:1 – 16; 94:2 – 95:7; 101:12 – 102:1.

attempted to split his homestead into two parcels was to avoid liability for a water ski course.[159]

As a threshold matter, PRN never specifically pled those alleged false oaths as a basis for its § 727(a)(4)(A) claim. Other than a general allegation incorporating paragraphs 135 through 200 of the Third Amended Complaint, Count 11 contains one substantive allegation:

> The Debtor knowingly and fraudulently, in or in connection with this case has made multiple false oaths and accounts, including: i) failing to include all assets in his Schedules and SOFA while testifying under oath they were accurate; ii) failing to provide accurate information with respect to his income; iii) claiming that he is utilizing assets he claims are owed as tenancies-by-the-entirety in order to fund his lifestyle; and iv) claiming that Coledev is owned as tenancy by the entireties while recently stating under oath he was the sole owner of the same.[160]

That allegation makes no mention of the alleged false oaths regarding Cole's homestead.[161]

It is true that paragraphs 150 through 165, which were incorporated into Count 11, include allegations that Cole claimed he did not own the 2.185-acre parcel of Unimproved Land and that he split his homestead because of liability concerns. PRN's conduct in this proceeding, however, shows that even PRN understood those allegations were not a basis for its § 727(a)(4)(A) false oath claim.

---

[159] *Pl.'s Resp. Pursuant to Order Permitting Parties to Identify Errors in Prelim. Mem. Op.*, Adv. Doc. No. 495, at 2 – 4.

[160] *Third Am. Compl.*, Adv. Doc. No. 230, at ¶ 211.

[161] *Id.*

For instance, PRN's pretrial statement, which identifies the factual and legal issues to be determined for each count, makes no mention of false oaths regarding Cole's homestead when discussing Count 11.[162] And nowhere in its post-trial brief does PRN argue that Cole's alleged false oaths regarding his homestead warrant denial of his discharge under § 727(a)(4)(A).[163] Simply put, PRN failed to properly plead Cole's alleged false oaths regarding his homestead as a basis for PRN's § 727(a)(4) false oath claim.

PRN now seeks leave to amend its pleadings to conform to the evidence at trial so it can assert Cole's alleged false oaths regarding his homestead as a basis for its § 727(a)(4) claim. Under Rule 15, PRN may move to amend its pleadings—even after trial—if an issue not raised by the pleadings was tried by the parties' express or implied consent.[164] An issue can be tried by implied consent if, as PRN essentially contends here, a party fails to object to the introduction of evidence raising issues outside the pleadings.[165] That is true, however, only if the evidence that comes in without objection is not relevant to issues already within the pleadings.[166] If the evidence being introduced is arguably relevant to other properly pled issues, then the evidence would

---

[162] *Pl.'s Pretrial Statement With Respect to Final Hr'g*, Adv. Doc. No. 382, at ¶ 39.

[163] *Pl.'s Post-Trial Brief*, Adv. Doc. No. 435.

[164] Fed. R. Civ. P. 15(b)(2).

[165] *Doe #6 v. Miami-Dade Cty.*, 974 F.3d 1333, 1339 (11th Cir. 2020).

[166] *Id.* ("For example, '[f]ailure to object to evidence raising issues outside of the pleadings constitutes implied consent as long as the evidence is not relevant to issues already within the pleadings.'") (quoting *United States ex rel. Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 677 (11th Cir. 1987)).

*not* give the opposing party "fair notice that new issues are entering the case" or establish implied consent.[167]

Here, all the evidence relevant to Cole's alleged false oaths regarding his homestead were relevant to issues already within the pleadings—e.g., whether Cole fraudulently concealed his homestead. So, PRN has failed to establish any implied consent by Cole. It would be unfair and prejudicial to Cole to allow PRN to "fix" any pleading oversight or to add a new count after the Court has issued its Preliminary Memorandum Opinion. PRN's request to amend its pleadings to conform to the evidence, therefore, is denied.

But, even if the Court did allow PRN to proceed with a § 727(a)(4)(A) false oath claim based on Cole's alleged false oaths regarding his homestead, PRN would not prevail. PRN has not proven Cole fraudulently made false oaths regarding his homestead.

Take the statement in the schedules that the Improved Land and Unimproved Land were two parcels. Although PRN argues the parcels previously were contiguous, when Cole filed this bankruptcy case, the statement was true. Cole could not create a false impression by listing his homestead as two parcels because, on the petition date, they legally were divided into two parcels. However, to prevent any misunderstanding by the Trustee, on the day Cole filed this bankruptcy case, his lawyer contacted the Trustee, told her they needed to meet about the case, and asked her to bring her counsel

---

[167] *Id.*

along.[168] During that initial meeting, which took place before Cole even filed his schedules, Cole explained to the Trustee he recently had divided his homestead into the two parcels.[169] That belies any claim that Cole *fraudulently* misstated that the Improved Land and Unimproved Land were two parcels.

As for the reason Cole gave for splitting his homestead into two parcels (i.e., to avoid liability for a water ski course), PRN argues it was obviously a lie because Cole continued to own both parcels after the split. And PRN says the alleged false statement was fraudulent because it was done cover up his attempt to gerrymander his homestead. But, to repeat, Cole disclosed to the Trustee—even before he filed his schedules—that he split his homestead into two parcels. The stated reason for the homestead division is largely irrelevant when Cole disclosed the recent deeds literally on the day he filed this bankruptcy.  No fraudulent misrepresentations were made.

That leaves Cole's claim that the State of Florida owned the submerged Unimproved Land. Judge Jackson considered that very issue at the trial on PRN's and the Trustee's objections to Cole's homestead exemption claim.[170] In declining to rule who owned the Unimproved Land, Judge Jackson observed that the ownership issue was "both fascinating and complex." [171] And she noted that both PRN and Cole

---

[168] Trial Tr. 1368:6 – 15.

[169] *Id.* at 1368:6 – 1369:8.

[170] *Mem. Decision Sustaining, In Part, Objs. to Debtor's Claim of Exemption*, Case No. 6:15-bk-06458-KSJ, Doc. No. 788, at 17.

[171] *Id.*

presented "reasoned arguments."[172] Given Judge Jackson's observation that Cole presented a reasoned argument on a complex issue, I cannot conclude Cole *fraudulently* made a false oath regarding who owned the Unimproved Land (either at the homestead exemption trial or the trial in this proceeding).

PRN has failed to prove Cole made any false oath in his bankruptcy papers that would preclude entry of a discharge. Cole is entitled to judgment in his favor and against PRN on Count 11.

**VII.    Conclusion.**

PRN asserts many bases for making its debt nondischargeable or for denying Cole a discharge. PRN has proven no reason to grant these requests. The Court acknowledges this is a tough case with a robust history between the parties. But now it is time to conclude this litigation. Cole will receive a discharge. And his debt to PRN, whenever liquidated, is dischargeable.

### ###

Attorney Christopher R. Thompson will serve a copy of this Preliminary Memorandum Opinion on interested parties who do not receive service by CM/ECF and will file a proof of service within 3 days of entry of the Opinion.

---

[172] *Id.*